JAMES AND BLAKE *v.* VANDERHEYDEN AND ANOTHER.

It is essential to an escrow that it be delivered to a third person to be delivered to the obligee or grantee upon the happening of some event, or upon the performance of some condition.

Where a bond and mortgage and deed were delivered to a third person to be kept by him during the pleasure of the parties, and subject to their further order, held that the papers were not escrows, and that he was a mere depositary.

IN January, 1823, S. Vanderheyden, deceased, and the plaintiff Blake, entered into a written agreement, by which the latter agreed to sell to the former a farm in Saratoga for $6,000. Blake was to convey the farm freed and discharged from every incumbrance or lien, judgment or demand of every kind, in law or equity, with covenants of warranty as to the title and the quantity of land contained in the farm ; and the purchaser was to secure $4,500 of the purchase-money, by bond and mortgage on the premises, payable in eight years from the date of the mortgage with annual interest, and give his obligation for the remaining $1,500, payable in goods in three annual payments from the date of the obligation. About the 1st of March, 1823, under the supposition that the agreement would be carried into effect, Vanderheyden contracted with J. Adams to let the farm to him, and he went into possession soon after that time, and has remained there ever since. At the time of the agreement, J. Thompson held a mortgage and judgment against Ring, the former owner of the farm, for about $4,000, which were liens thereon, and Blake was not able to complete the title, in consequence of not being able to raise the money to pay off these incumbrances. Both parties being anxious to consummate the purchase with the least possible delay, and Vanderheyden being at Saratoga with his wife, on the 5th of April, 1823, *the deed and bonds and mortgage were drawn and acknowledged, and

Feb. 3d.

[*386]

1829.

James
v.
Vanderheyden

at the suggestion of R. M. Livingston, an attorney, left in his hands as "escrows," with written instructions; and to be kept by him subject to such order of the parties as should arise out of any subsequent agreement between them. Livingston also testified that it was the understanding of the parties at the time the papers were drawn, that the deed and mortgage should be recorded. After the papers were completed and ready for delivery, Vanderheyden brought them to Livingston, together with a written memorandum, signed by both parties, in the words following:

"Be it remembered that R. M. Livingston, Esq., has received of Robert Blake and Samuel Vanderheyden, as escrows, the following papers, to wit, a deed from Robert Blake to Samuel Vanderheyden, conveying the Ring farm, (so called;) a bond and mortgage for $4,500; a bond conditioned for the payment of $1,500 worth of goods given by the said Samuel; which said several instruments it is hereby agreed that R. M. Livingston, Esq., shall hold as escrows during the joint pleasure of the said Robert and Samuel, or their legal representatives.          S. VANDERHEYDEN.

"Saratoga, April 5th, 1823.          R. BLAKE."

About three weeks after the papers were left in the hands of Livingston with this written memorandum of the parties, he carried the deed and mortgage to the clerk's office and had them recorded. Nothing was done by Blake towards removing the incumbrances from the farm, or consummating the bargain previous to the death of Vanderheyden in November thereafter. In the fall of 1823, Vanderheyden was applied to by Adams for a written agreement respecting the occupation of the farm; but he declined giving one at that time, on the ground that the bargain between him and Blake was not yet completed. Vanderheyden died without children, but leaving his wife then *enciente* with the defendant S. D. Vanderheyden, who was born some months after the death of his father. The executors named in the will of S. Vanderheyden renounced the execution thereof, and the validity of the will was a long time in contest between

the widow and collateral kindred of the deceased; and administration with the will annexed was finally given to the widow *in the spring of 1826. In March, 1824, Livingston delivered up the bonds and mortgage to the complainants, on receiving an agreement from James to pay off the incumbrances which Thompson held against the farm; and Blake thereupon assigned the bonds and mortgage and all his interest in the mortgaged premises to James, to secure the payment of a note upon which the latter was his indorser at the bank. James, finding there were other incumbrances on the farm, instead of paying up and discharging the mortgage and judgment held by Thompson, advanced him the amount and took an assignment of his claims. He afterwards offered to assign these incumbrances to the administratrix, or to discharge them if she preferred that course; but she declined doing anything on the subject.

The complainants thereupon filed their bill in this cause, without any allusion to the agreement of January, 1823, but setting out an agreement materially different for the sale of the premises, alleged to have been made on the day of the date of the deed and mortgage, and praying a foreclosure and sale of the mortgaged premises, and the payment of the balance of the bonds out of the estate of Vanderheyden, and for general relief. The defendants, by their answer, denied the validity of the deed and bonds and mortgage, and set out the agreement of January, 1823, and insisted that the title to the farm was defective; and setting out various incumbrances besides those assigned to James by Thompson, which they insisted were liens on the premises. The cause was heard on pleadings and proofs.

*J. King*, for the plaintiffs.

*A. Van Vechten*, for the defendants.

THE CHANCELLOR:—The writings left in the hands of Livingston, although called by him and the parties escrows,

were not so in fact. It is essential to an escrow that it be delivered to a third person, to be delivered by him to the obligee or grantee, upon the happening of some event or the *performance of some condition, from which time it becomes an absolute deed.[1] But whether we are confined to the written agreement signed by the parties and deposited with the papers, specifying the conditions on which they were left with Livingston, or are permitted to resort to the parol conversations and declarations of the parties previous to the execution of that paper, there is no evidence that they ever intended to authorize him to deliver up the papers to either party without some further directions from both. He swears that he proposed they should leave the papers with him as " escrows," and that they should leave with him written instructions relative to the manner in which he was to dispose of them ; and that they should be kept by him subject to such order of the parties as should arise out of any subsequent agreement between them. He drew several memorandums specifying the terms, but Vanderheyden rejected the whole, and finally drew for himself the one now before the court. This was

[1] *Kiersted* v. *Avery*, 4 Paige, 9; *Johnson* v. *Catlin*, 2 John. Ch. 248; *Gilman* v. *Church*, 15 Wen. 656 ; *Johnson* v. *Baker*, 4 Barn. & Ald. 440; 4 Kent. 454. Such delivery must be to a stranger, and not to one of the parties. 10 Smeed. & M. 9. The presence nor express assent of the grantee is not necessary. *Merrils* v. *Swift*, 18 Conn. 257 ; see also *Tompkins* v. *Wheeler*, 16 Peters, 106; *Wesson* v. *Stephens*, 2 Ired. Eq. 557. Such assent will be presumed, from the beneficial interest of the grantee in the deed, unless a dissent is proved. *Lady Superior, &c.* v. *McNamara*, 3 Barb. Ch. 375.

" An *escrow*," says Chancellor Kent, "is only a conditional delivery to a stranger, who is to keep the deed until certain conditions are performed, when he is to deliver it to the grantee. Until the conditions are satisfied the estate does not pass, but remains in the grantor. It becomes absolute from the time of the second delivery : but this general rule does not apply when justice requires a resort to fiction. The relation back to the first delivery, so as to give the deed effect from that time, is allowed in cases of necessity, to avoid injury to the operation of the deed from events happening between the first and second delivery. Thus, if the grantor was a *feme sole* when she executed the deed, and she married before it ceases to be an escrow by the second delivery." 4 Kent. 454.

probably signed by the parties at the time they signed the other papers. Livingston was not present, and never saw the parties together afterwards. It would, therefore, be a dangerous species of evidence to substitute his belief of what the parties intended, derived from their previous conversations, for this written and formal declaration of their intent. It is probable that Vanderheyden supposed there were no other incumbrances on the farm than those in the hands of Thompson; but that was not sufficient to authorize the witness to infer an agreement that he would take the title subject to all others which might be discovered before the agreement was actually completed, and look to the personal responsibility of Blake for his indemnity. The written memorandum shows that the papers were left with Livingston as a mere depository, and that it was not intended they should become absolute deeds without the farther consent of both parties authorizing a delivery as such. Livingston swears that Vanderheyden came to him alone, and brought the papers and written agreement in their present situation, and that he also directed him to have them recorded. In this he is partially supported by the imperfect recollection of his wife. On the other hand, Dr. Douglass and D. Buel, junior, *testify that Livingston told them he put the papers on record of his own accord. It is not material to decide which is right in this particular. After the lapse of three or four years, he may very honestly have substituted the declarations of the parties when they were together at the drawing of the papers, for a supposed direction given to him by Vanderheyden at the time they were left in his hands. In either case, he would be likely to leave them to be recorded, unless there was some express prohibition; but in neither case would it alter the nature of the transaction as between the parties. Livingston himself swears that he supposed the recording the papers would not alter the rights of the parties, and therefore he made no suggestion that it would be improper. The other parties undoubtedly acted on the same supposition,

*1829.*

James
v.
Vanderheyden

[*389]

and Vanderheyden particularly, as, notwithstanding any directions he might have given as to the recording, he was so careful as to indorse the word " escrow " on the back of each instrument. This clearly shows he never intended the papers to operate as absolute deeds without some further agreement or understanding between him and Blake. Admitting, for a moment, that the recording of these papers would at law give them a different effect from what was intended by the parties, surely a party who comes into a court of equity for relief cannot be permitted to gain any advantage from that mistake.

This is not the case of a *bona fide* purchaser of the legal estate, without notice of a latent equity which is attempted to be set up to defeat his title. James in this case is in no better situation than Blake. He is the assignee of a chose in action, with sufficient notice to put him on inquiry. He has not been injured by any mistakes of the other parties, as he took the assignment to indemnify himself against a pre-existing responsibility. Under the assignment from Blake he has all the legal title to the farm which Blake had; and it would be inequitable to compel the representatives of Vanderheyden to take an incumbered farm or a defective title, and look to the responsibility of Blake, who has left the state, and is probably insolvent.

[*390]

*The complainants dare not even pay off the incumbrances which have been assigned to them, because they see that the lien of Knickerbacker's judgment would then attach upon the whole farm, as it does now upon the surplus value over and above those incumbrances. Those incumbrances are about three-fourths of the value of the farm, and it will be necessary to foreclose the mortgage and sell on the judgments, or buy off Knickerbacker's lien, before a good title can be had. This is an expense which at all events ought to be sustained by Blake, and not by the defendants.

But there is also a failure of title as to forty acres of the farm. More than twenty-five years ago, G. Seymour purchased this forty acres of Andrews, who was in possession

claiming title, and paid $1,000 for the purchase-money. Seymour went on to the same and died there, leaving his widow in possession with her infant daughter. The widow married Lee, who came on to the farm with her, and afterwards, without any right, sold the forty acres to St. John or Tull, from whom Davis purchased. Ring purchased of Davis, and Blake of Ring. This testimony would be sufficient to enable the daughter of Seymour to recover in ejectment against any one deriving title under Blake. It is not material to inquire whether there is sufficient evidence of the loss of the deed to Seymour. He paid the consideration money, and was entitled to a deed, and under the circumstances it may probably be presumed. But even if the legal title still remains in Andrews, it is out of the complainants, and renders their title to the forty acres equally defective. I am therefore satisfied it would be inequitable and unjust to enforce these bonds and the mortgage against the defendants before a perfect title can be made to the farm, and free from all incumbrances.

If the complainants can satisfy these outstanding claims and clear the premises, they may perhaps even now be entitled to a specific performance of the original agreement of January, 1823; but on this question I have not formed any definite opinion. This bill is not properly framed for such relief in this suit, because no such agreement is set out, but one entirely different. If the complainants intend to avail themselves of that agreement hereafter, they are at liberty to have this bill *dismissed with costs, but without prejudice to their right to file a new bill for that purpose.

But there is one kind of relief which the complainants are entitled to, if they prefer to abandon the contract of January, 1823. The deed and mortgage remaining on the records of the county are a cloud upon the title: they are therefore entitled to a decree declaring the deed and mortgage void and inoperative; and if they abandon the contract of sale, they will be entitled to an account of the rents

1829.

James
v.
Vanderheyden

[*391]

and profits of the farm while it has been in the possession of Vanderheyden or his tenant, after deducting therefrom the defendant's costs in this suit to be taxed.